[Cite as *State v. Williamson*, 2017-Ohio-7098.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27147 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-2941 |
| | : | |
| DASHAWN E. WILLIAMSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 4th day of August, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LYNNE R. NOTHSTINE, Atty. Reg. No. 0061560, and ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorneys, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorneys for Plaintiff-Appellee

CHRISTOPHER A. DEAL, Atty. Reg. No. 0078510, 2541 Shiloh Springs Road, Dayton, Ohio 45426
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} This case is before us on the appeal of Defendant-Appellant, Deshawn Williamson, from his convictions and sentences for possession of heroin and possession of cocaine. According to Williamson, the trial court abused its discretion by admitting a jailhouse recording without proper authentication and also erred by denying his motion to suppress. In addition, Williamson contends that there was insufficient evidence to sustain his convictions, and that the verdict was against the manifest weight of the evidence.

{¶ 2} For the reasons discussed below, we find no reversible error. The trial court did not err in allowing a redacted jail telephone call to be admitted into evidence. First of all, Appellant waived any error by failing to accept the State's offer to make another copy of the jail call. In addition, no error occurred, as the State met the threshold requirement for authentication. Even if error had occurred, there was no basis for reversing the judgment under a plain error analysis.

{¶ 3} The judgment was also not against the manifest weight of the evidence and was supported by sufficient evidence. Finally, the trial court did not err in overruling Appellant's motion to suppress evidence. Police officers had a reasonable, articulable suspicion for detaining Appellant, and no evidence was obtained during the detention. Concerning a warrantless search of an automobile Appellant had been driving, Appellant disclaimed any interest in the automobile or its contents. As a result, Appellant had no legitimate expectation of privacy in the automobile or its contents, and had no cognizable Fourth Amendment challenge to the officers' search. Accordingly, the judgment of the trial court will be affirmed.

## I. Statement of Facts and Course of Proceedings

{¶ 4} On September 18, 2015, Dayton Police Detective, Dustin Phillips, was working in an undercover capacity in an unmarked car in the Crown Point or Residence Park area of Dayton, Ohio. This area included Midway, Hollencamp, and Malden Avenues. At the time, Phillips was assigned to the narcotics bureau and focused much of his street time on narcotics investigations. The police had extensive experience in this particular area and had made numerous drug and weapons arrests. Because Phillips could not make traffic stops while using an unmarked car, Officer Rhodes was nearby in a police cruiser; Phillips was communicating with Rhodes via radio.

{¶ 5} Around noon, Phillips saw a red pickup truck on Midway Avenue that caught his attention. Three people were in the truck, and the driver was talking on a cell phone, which was activity Phillips had often observed as part of his drug investigations. The vehicle was traveling slowly, and then pulled over and stopped in front of a vacant lot. Again, Phillips had seen this behavior a number of times during his investigations. At the time, Phillips was traveling westbound on Midway behind the truck. To avoid arousing suspicion, Phillips continued to the next intersection, which was located at Hollencamp and Midway Avenues. At that point, Phillips was watching the truck through his interior rear view mirror and side mirror to see if anyone exited the truck or if the truck pulled back into traffic. This did not occur, however.

{¶ 6} Phillips came to a stop sign and waited a few seconds. He then saw another vehicle traveling northbound on Hollencamp, towards his own car. Because the vehicle was less than a minute away, Phillips waited at the stop sign. The area was residential,

and seeing more than two vehicles in a block would be unusual. The approaching car was a white 2005 Chrysler 300. When the Chrysler reached the intersection, it turned right onto Midway, and drove eastbound past Phillips, toward the red pickup truck.

{¶ 7} As the Chrysler passed, Phillips saw there was only one occupant, the driver. He made note of the physical description, and also noticed that the vehicle's side and rear windows were heavily tinted, while the front window was not tinted. He was only able to observe the driver for a brief time, about three seconds, but was able to see his face. The driver had short, somewhat spiked-up dreadlocks, about the size of a pencil, and the dreadlocks stuck directly up from the driver's head.

{¶ 8} Phillips had been working in the same area for a long time, and came in contact with the same people over and over again. As a result, he made a habit of looking for individuals he knew when he saw vehicles, and following up with some type of action, like a traffic stop. Phillips did not recognize the driver, but could identify the driver if he saw him again. In court, Phillips positively identified Williamson as the person who was driving the Chrysler.

{¶ 9} After the Chrysler passed Phillips, it pulled directly up next to the truck, with the driver's side windows of the two vehicles facing each other. Phillips saw the hands of the drivers of both vehicles reach out, stay next to each other for two or three seconds, and then come back into their vehicles. At this point, both vehicles drove off, traveling in opposite directions. Phillips believed he had seen suspicious activity, and radioed Rhodes for assistance.

{¶ 10} Phillips focused his attention on the Chrysler, based on his training and experience, and the particular neighborhood. He had to do a U-turn to follow the car, but

waited until the car was out of his sight to avoid alerting the driver. Luckily, the Chrysler immediately turned left at the next intersection, onto Malden Avenue. As soon as the car turned, Phillips made a U-turn and traveled behind it. He turned left on Malden and saw the Chrysler again. The Chrysler had been out of his sight for only about five seconds, and was still traveling. Officer Rhodes was nearby, and as the Chrysler made its way up Malden, Rhodes was approaching the intersection of Malden and Second Street.

{¶ 11} When the Chrysler crossed Second Street, Phillips was about half a block away on Malden. After crossing Second Street, the Chrysler pulled into a driveway at 426 Malden. Malden ends in a cul-de-sac, and there is not a lot of traffic since it is not a through street. At that point, Phillips was at the intersection of Malden and Second, and waited for Rhodes to pull his cruiser in front of Phillips' car. This was a safety measure, because people can think they are being ambushed and open fire on unmarked vehicles.

{¶ 12} Rhodes pulled into the driveway at 426 Malden, and Phillips parked behind him. Phillips was not able to see what had happened to the occupant of the vehicle after it pulled into the driveway. As a result, the officers approached the Chrysler cautiously, from both sides of the car. No one was inside the car, and it was still running.

{¶ 13} The backyard was somewhat open, and Phillips could have seen if someone were in the yard. The garage door was open, and Phillips thought someone may have run inside the garage. Rhodes stayed at the back corner of the house, while Phillips went to the opposite corner of the house. All windows, doors, and points of entrance and exit were covered. Phillips had not yet reached the corner of the house when he heard a window opening just around the corner from where he was walking. He did not go around the corner, but stayed on the front corner of the house, where he was

able to see a reflection from a neighbor's windows. Phillips saw a window opening and a man (subsequently identified as Williamson) coming out. When Williamson jumped onto the ground, Phillips immediately recognized him as the person he had seen driving the Chrysler.

{¶ 14} After Williamson jumped onto the ground, Phillips identified himself as a police officer and ordered Williamson to the ground. Williamson complied, but before getting all the way down, Williamson pulled out a flip phone. He opened the phone with his thumb, jammed the screen into the ground, and broke the phone in half. At that point, the police officers handcuffed Williamson. Because Williamson had jumped out of the window, the officers asked if this was his house or if someone else was inside. Williamson refused to answer. The officers then entered the house for the safety of others, since they did not know if Williamson belonged at the house or had simply run through the house from the vehicle. They found another person in the house, but this was not the person who had been in the Chrysler.

{¶ 15} Subsequently, when the officers checked the Chrysler, they found a bag of capsules wrapped up in a sandwich baggie. The baggie was sitting on the passenger seat and could be easily accessed. Subsequent testing indicated that the baggie contained 230 unit doses of heroin. The officers also found an additional baggie in the middle console, in the ashtray, just below the radio. Testing indicated that this baggie contained about 4.75 grams of cocaine. In addition, the officers found drugs in the house and a gun in the garage, but Williamson was not charged with offenses relating to these items.

{¶ 16} After Williamson was arrested, he was indicted, as indicated, on one count

of possession of heroin in an amount exceeding 100 doses and less than 500 doses, a second-degree felony; one count of possession of cocaine in an amount less than 5 grams, a fifth-degree felony; and tampering with evidence, a third-degree felony.

{¶ 17} In November 2015, Williamson filed a motion to suppress, which was overruled after a hearing on the motion. Following a jury trial, Williamson was found guilty of the heroin and cocaine charges, and not guilty of tampering with evidence. He received a mandatory sentence of five years in prison on the heroin conviction, and eight months on the cocaine conviction, with the terms to be served concurrently. Williamson then appealed from his convictions and sentences.


II.   Did the Court Err in Admitting a Jail Recording?

{¶ 18} Williamson's First Assignment of Error states that:

The Trial Court Abused Its Discretion When It Admitted the Jailhouse Recording Without Proper Authentication Based on Evid. R. 901.

{¶ 19} This assignment of error is based on the contention that the trial court erred in admitting a jail recording because the recording was not properly authenticated under Evid.R. 901. According to Williamson, the minimum threshold for authentication was not met because of various deficiencies, including: generic testimony about how calls are recorded and kept, rather than specific testimony about this case; the fact that the recording does not identify the "PIN" number used to generate the call; the fact that no witness identified Williamson's voice; and the fact that the authenticating witness did not know the date of the call or what method was used to search for the calls, and could not state with certainty what PIN number was entered.

{¶ 20} As a condition precedent to admissibility, Evid.R. 901(A) requires authentication by "evidence sufficient to support a finding that the matter in question is what its proponent claims." This is a low threshold, "requiring only foundational evidence for the trier of fact to conclude that the evidence is indeed what the proponent claims it to be." (Citations omitted.) *State v. Dawson*, 2d Dist. Greene No. 2009-CA-63, 2010-Ohio-3904, ¶ 13. "The testimony of a witness with knowledge is sufficient authentication." *Id.*, citing Evid.R. 901(B)(1).

{¶ 21} In response to Williamson's argument, the State contends that while telephone conversations are typically authenticated under Evid.R. 901(B)(5) or (6), they may also be authenticated under Evid.R. 901(B)(4), which allows authentication based on "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Based on this theory, the State contends that under the totality of circumstances, it is improbable that the telephone call was made by anyone other than Williamson, due to the call's timing and the fact that the caller's comments match the testimony of Detective Phillips.

{¶ 22} Trial courts have discretion over the admission of evidence, and we review their decisions for abuse of discretion. *State v. Rios*, 2d Dist. Clark No. 10CA0059, 2011-Ohio-4720, ¶ 7, citing *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary, or unconscionable." (Citation omitted.) *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable * * *." *Id.* "A decision is unreasonable if there is no sound reasoning process that would

support that decision." *Id.*

{¶ 23} In *State v. Wheeler*, 2d Dist. Montgomery No. 12290, 1993 WL 265133 (July 16, 1993), we commented that "[t]ypically, telephone conversations are authenticated through Evid.R. 901(B)(6), which covers * * * telephone calls placed by the witness himself, or Evid.R. 901(B)(5), which permits authentication when the witness is able to identify the other caller because he recognizes that caller's voice." *Id.* at *2. However, the conversation in *Wheeler* could not be authenticated in these ways because the police officer who answered the telephone the defendant called did not know the defendant. We noted that in such situations, "Rule 901(B)(4) contemplates that a caller may be identified by the fact that the speech could only have been uttered by him, under the circumstances. 'A letter or a voice over the telephone may be related to a particular person by the very fact that the matters set forth in the letter or the telephone conversation were known peculiarly to a particular person.' " *Id.*, quoting 1980 Staff Note, Evid.R. 901.

{¶ 24} We have also said that " '[t]elephone conversations are admitted where the identity of the parties is "satisfactorily explained." ' " *State v. Carr-Poindexter*, 2d Dist. Montgomery No. 20197, 2005-Ohio-1571, ¶ 24, quoting *State v. Williams*, 64 Ohio App.2d 271, 274, 413 N.E.2d 1212 (8th Dist.1979). In *Carr-Poindexter*, we stressed that such testimony is properly admitted " 'where there is a reasonable showing, through testimony or other evidence, that the witness placed or received a call as alleged, plus some indication of the identity of the person spoken to. "There is no fixed identification requirement for all calls." * * * "Each case has its own set of facts." ' " *Id.*, quoting *State v. Vrona*, 47 Ohio App.3d 145, 149, 547 N.E.2d 1189 (9th Dist.1988). These facts may be established through either direct or circumstantial evidence. *Id.*, citing *Williams* at

274.

{¶ 25} We have reviewed the transcript as well as the content of the telephone call. Deputy Sergeant Vitali, who supervises day-to-day management in the Montgomery County Jail, testified that he had access to the electronic records in the jail's computerized system. Vitali explained the process by which inmates may make calls. Inmates use a phone in their cell or housing area, and input their personal PIN number, which is the last four digits of their armbands plus the last four digits of their social security numbers. As calls are being made, they are recorded. The PIN number is unique to each inmate. Phone records are maintained by a computer system, and are accessed with a login and password.

{¶ 26} In order to search for particular telephone calls, police can use various parameters like a phone number to which a call was made, an inmate's armband number, or an inmate's last name. Once phone calls are located, they can be downloaded from the server. During the download process, no alterations, modifications, or deletions are made to any part of a call. Vitali's testimony also clearly indicated that these records are maintained in the ordinary course of business and that he is a custodian of records.

{¶ 27} State's Ex. 11 was a CD containing a redacted telephone call made from the jail on the day Williamson was arrested. Vitali did not make the CD, nor did he personally pull the records from which it was made. He also could not say with certainty what PIN number had been entered, and did acknowledge that inmates can share armband numbers, even though they are not supposed to do so. Vitali testified that he had reviewed the CD and listened to the telephone call. He stated that the content appeared to be a fair and accurate copy of a Pay Tel download

{¶ 28} During a sidebar conference, the State acknowledged that the computer download does not give the PIN number associated with the account. However, the State stressed that officers who have access to the system are able to search by inmate number or PIN number, and that the officers pulled the recording in question from the phone calls obtained during a search for Williamson's records.

{¶ 29} After the defense cross-examined Vitali, the defense again objected to having the jury hear the recording, because there was nothing to connect the phone call to Williamson. At this point, the State offered to have Vitali go directly to the jail and make a new recording, but the defense stated that would not be necessary. In this context, the following discussion occurred:

MS. HENNE: If the Court's inclined not to let it in on the basis that they don't know necessarily that he's [the defendant's] the one to do it – now, because I've had this discussion many times with Sergeant Vitali, that they don't listen to phone calls, that he, himself, because of all the requests, doesn't pull them, we can have a brief recess. He can go directly to the jail and make a new disc, and make a new recording and make this recording.

Again, there's this one, for evidentiary purposes, just has several clips for evidentiary reasons that we've redacted part of it. But you can go over and do that if that's –

MR. CHRISTON: Yeah. No. No. I'm not – see, I'm not – I'm not arguing that he go over there and do that. What I'm suggesting is, even if he did (indiscernible), so he do that, I'm – I believe that he did that with the disc that you sent me. I believe that. Okay? What I'm saying is

basically, he can't tell us that this is Mr. Williamson.

\* \* \*

THE COURT:  Do we at least – do we even have it in the record right now that the defendant was in the jail on the day this – these calls were made?

MS.  HENNE:  We do – \* \* \* because he was arrested on the date of the incident.  At the end of the phone call, had the same date of the incident.

MR. CHRISTON:  (Indiscernible) we will concede that he was in jail.

THE COURT:  You agree (indiscernible)?

MR. CHRISTON:  Yeah, yeah.

THE COURT:  All right.  He was in the jail.  We've got evidence that was made from a jail call that came to the jail.

MR. CHRISTON:  No. That – that went out.

MS.  HENNE:  Went out.

MR.  CHRISTON:  Yeah, yeah.

MS.  HENNE:  By an inmate.

MR. CHRISTON:  By an inmate.

MS. HENNE:  Again, it goes –

THE COURT:  And you've had this disc?  It was provided in discovery and you've been able to listen to it?

\* \* \*

MR. CHRISTON:  I have – I have all of them, about 27.

MS. HENNE:   He has all of the phone calls.

* * *

MS. HENNE:   This is just one of them.

MR. CHRISTON:   Yeah.   Yeah.

THE COURT:   Overrule the objection.

Transcript of Proceedings, Vol. II, pp. 316-318.

{¶ 30} The recording was then played for the jury.   After considering the record, we conclude that the trial court did not err in allowing the CD to be played.   As an initial matter, while testimony from the jail employee who conducted the initial search for phone calls may have been preferable for purposes of definitively connecting the call to Williamson's PIN number, we conclude that Williamson waived any objection in this regard.   Specifically, the State offered to take a recess and have Vitali conduct a new search, but Williamson declined the offer.   If Williamson were truly concerned about this point, he would have asked the State to do what it suggested.   When waiver occurs, error will be considered only on the basis of plain error.   *See, e.g., State v. Cephus*, 161 Ohio App.3d 385, 2005-Ohio-2752, 830 N.E.2d 433, ¶ 34 (2d Dist.).   "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been different."   *Id.*, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1979).

{¶ 31} Taking the remaining evidence into consideration, we conclude that neither plain error nor any error occurred.   Specifically, the threshold test of authentication was met, and the jury could decide the weight to give the phone call.   *See State v. Harmon*, 2d Dist. Clark No. 2932, 1993 WL 55967, *4 (Mar. 2, 1993) (jury decides "how authentic an item of evidence is, and * * * [gives] it weight accordingly"); *State v. Isley*, 9th Dist.

Summit No. 17485, 1996 WL 351154, *2 (June 26, 1996) (once judge decides " 'threshold test of authentication has been met and submits the evidence to the jury, the jury may reject the authenticity of the evidence' "); *State v. Taylor*, 2d Dist. Miami No. 2005 CA 44, 2006-Ohio-6813, ¶ 30 (once court decides to admit evidence, weight to be given is for trier of fact).

{¶ 32} As was noted, the threshold for authenticating evidence is low and only requires "sufficient foundational evidence * * *."  (Citation omitted).  *State v. Young*, 2d Dist. Montgomery No. 18874, 2002 WL 471846, *2 (Mar. 29, 2002).  *See also State v. Moore*, 2015-Ohio-1327, 30 N.E.3d 988, ¶ 18 (2d Dist.).

{¶ 33} The telephone call itself was made from the jail during the late afternoon of September 18, 2015 (the date of the crime and arrest), and Williamson did not dispute that he was in jail at the time.   In addition, the caller stated that he was being charged with an "F2 possession," which was one of Williamson's charges.   The caller's other statements were also consistent with the testimony of Detective Phillips.   Specifically, the caller stated that "they" had gotten the car, that he was not with anyone else, that "they" did not get him out of the car or pull him over or anything like that, and that he had broken the phone.   While it is theoretically possible that another jail inmate could have encountered these similar circumstances on the same date, it is highly improbable, particularly when one considers the reference to a broken phone.

{¶ 34} Finally, even if we considered the admission of the phone call as error, we cannot say the outcome of the trial would have been different.   In *Long*, the court stressed that "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of

justice." *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus. This is not such a case.

{¶ 35} The only argument Williamson makes in this regard is that no physical evidence connected him to the crime; instead, the only evidence was Detective Phillips' testimony that he could identify Williamson as the driver after seeing him in a vehicle with tinted windows for less than three seconds.

{¶ 36} The evidence presented at trial, physical or otherwise, was as follows: (1) Phillips' testimony about his observations; (2) Deputy Sergeant Vitali's testimony about the jail calls; and (3) a forensic scientist's testimony about the drugs found in the car. The two latter testimonies are irrelevant to this analysis.

{¶ 37} Phillips testified that when the Chrysler 300 turned and traveled past him, he noted the driver's physical description, which included spiked dreadlocks about the size of pencils sticking up from the driver's head. Although Phillips had a fairly brief look at the driver, he stressed that he was able to see the driver's face and hair.

{¶ 38} From that point on, until the Chrysler 300 pulled into the driveway, the Chrysler was out of Phillips' sight for about five seconds, when Williamson turned left onto Malden, and Phillips made a U-turn to follow it. When the police officers arrived at the Malden residence, the Chrysler was in the driveway, still running. After going to the side of the house, Phillips saw a man exiting through a window and immediately recognized the man as the one he had seen driving the car. Phillips stated that he was 100% certain about his identification.

{¶ 39} At the time of Williamson's arrest, only one other person (Clemons) was inside the house, and his physical appearance was quite unlike that of Williamson. In

particular, Clemons had very short hair. *Compare* State's Ex. 7 with State's Ex. 8.

{¶ 40} Furthermore, the fact that Williamson attempted to exit the house from a window rather than a door was not normal behavior, but indicates that he was attempting to conceal his presence and flee. The Supreme Court of Ohio has said that "an accused's ' "flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." ' " *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 167, quoting *State v. Eaton*, 19 Ohio St.2d 145, 160, 249 N.E.2d 897 (1969). (Other citations omitted.)

{¶ 41} It is true that the Chrysler's window were tinted. We have reviewed the pictures and there is a tint on the front window. It is impossible to determine whether the pictures were taken during similar conditions as those on the day of the accident; more importantly, the picture was not taken with an individual inside the vehicle.

{¶ 42} During the trial, Detective Phillips was questioned about the tint, and was shown pictures. Phillips stated that while the tint on the front window appeared to be dark, it did not look the same as the tint on the other windows. He stated that he could see the plastic molding on the windshield through the window. In addition, he insisted that he could clearly see an individual in the car on the day of the incident, and that the picture shown at trial was not an accurate representation of what he saw the day of the crime.

{¶ 43} The Supreme Court of Ohio has said that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

The jury could have chosen to disbelieve Detective Phillips, but it did not. We defer to the jury's credibility determinations, and this is not the exceptional case that merits reversal based on plain error. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 44} Accordingly, the First Assignment of Error is overruled.

### III. Is the Conviction Supported by Sufficient Evidence or is the Conviction Against the Manifest Weight of the Evidence?

{¶ 45} Williamson's Second Assignment of Error states that:

There Was Insufficient Evidence to Sustain the Conviction for Possession of Heroin or Cocaine Because the State Failed to Put Forth Evidence of Possession and the Verdict Was Against the Manifest Weight of the Evidence.

{¶ 46} Under this assignment of error, Williamson contends that the judgment is supported by insufficient evidence or is against the manifest weight of the evidence. In support of this argument, Williamson points to several factors, including Detective Phillips' short length of time to observe the driver, while Phillips' attention was divided; the fact that Phillips lost sight of the car several times and did not see Williamson exit the car; the lack of DNA or fingerprint evidence connecting Williamson with the car; the fact that no drugs or weapons were found on Williamson's person; the lack of testimony from the occupants of the other vehicle; and the fact that Clemons (the other person in the house) did not testify.

{¶ 47} "A sufficiency-of-the-evidence argument challenges whether the state has

presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, ¶ 9 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). " 'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Cherry* at ¶ 9, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 48}** However, "[w]hen a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, 2013 WL 784643, ¶ 8, quoting *Thompkins* at 387. "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 49}** "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that

a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citation omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15. *Accord State v. Baum*, 2d Dist. Montgomery No. 27190, 2017-Ohio-981, ¶ 14.

{¶ 50} After reviewing the record, we again conclude that this is not the exceptional case in which the trier of fact clearly lost its way and created a miscarriage of justice. As was noted, Detective Philipps was able to get a good look at the driver, who sported a distinctive hair style. Phillips also immediately recognized Williamson as the man he had seen driving, and was 100% certain of his identification.

{¶ 51} The only time the car was actually out of Phillips' sight was when it turned left onto Malden, and the reality is that Phillips followed the car directly from the drug hand-off to the Malden residence – a distance of only a few blocks. While Phillips did not see Williamson get out of the car, a very short period of time elapsed between when the car turned into the driveway and when Phillips saw Williamson exiting the house through a window. Phillips indicated that the total time was less than a minute.

{¶ 52} Although Williamson challenges Phillips' testimony by claiming that he was distracted and could not properly see through the Chrysler's heavily tinted windows, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of the syllabus. We have stressed that "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of

appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, at *4.

{¶ 53} At trial, Phillips stated that he was able to see through the front window of the car, which was less tinted than the other car windows. As was noted, Phillips also said that pictures of the window tint the defense presented were not an accurate representation of what he saw the day of the arrest. The jury was able to hear the testimony and view the pictures, and clearly believed Phillips. Again, we give this decision substantial deference.

{¶ 54} Moreover, the fact that Williamson did not have actual possession of the drugs at the time of his arrest is irrelevant. The possession of cocaine and heroin charges were both alleged to be violations of R.C. 2925.11(A), which provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." R.C. 2901.22(B) defines "knowingly as follows:

A person acts knowingly, regardless of purpose, when the person is aware

that the person's conduct will probably cause a certain result or will probably

be of a certain nature. A person has knowledge of circumstances when

the person is aware that such circumstances probably exist.

{¶ 55} "Possession" is defined as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C.

2925.01(K).

**{¶ 56}** We have often said that drugs may be actually or constructively possessed. *See, e.g.*, *State v. Mabry*, 2d Dist. Montgomery No. 21569, 2007-Ohio-1895, ¶ 18. (Citation omitted.) "Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." (Citation omitted.) *State v. Hankerson*, 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982), syllabus.

**{¶ 57}** "Whether a person * * * knowingly possessed * * * a controlled substance is to be determined from all the attendant facts and circumstances available." *State v. Teamer*, 82 Ohio St.3d 490, 492, 696 N.E.2d 1049 (1998). Furthermore, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value * * *." *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus.

**{¶ 58}** As a result, the State did not have to prove that Williamson had actual possession of the drugs; it could rely on circumstantial evidence and constructive possession. The facts and circumstances of the case indicate that Detective Phillips saw Williamson driving the Chrysler 300 and engaging in what appeared to be a drug transaction. After Williamson was apprehended, the officers discovered the bag of heroin capsules sitting on the passenger seat of the car, and an additional baggie of cocaine in the middle console of the car, in the ashtray, just below the radio. Both items would have been easily accessible to the driver. Consequently, ample evidence existed from which a jury could conclude that Phillips knowingly had possession of the heroin and cocaine.

**{¶ 59}** Because the judgment was not against the manifest weight of the evidence,

it was also supported by sufficient evidence. Accordingly, the Second Assignment of Error is overruled.

### IV. Did the Trial Court Err in Overruling the Motion to Suppress?

{¶ 60} Williamson's Third Assignment of Error states that:

The Trial Court Erred When It Denied Appellant's Motion to Suppress as There Was No Probable Cause to Arrest the Defendant

{¶ 61} Under this assignment of error, Williamson contends that the trial court erred in overruling his motion to suppress. According to Williamson, the police had no probable cause to arrest and search him because Detective Phillips did not recognize Williamson (as a known criminal) when he first saw him, and because Phillips lost sight of Williamson briefly.

{¶ 62} The trial court rejected Williamson's motion, first, because the police had a reasonable, articulable suspicion for detaining Williamson. However, the court concluded that this was academic, because Williamson failed to claim what evidence should be suppressed as a result of an alleged illegal search of his person. In addition, the court found that Williamson had no expectation of privacy concerning the Chrysler 300, because Williamson indicated that he did not own the car, did not have permission to use it, did not operate it, and did not use it in the sense of placing any tangible items in the car.

{¶ 63} When a trial court rules on a motion to suppress, it "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." (Citation omitted.) *State v. Retherford*, 93 Ohio App.3d

586, 592, 639 N.E.2d 498 (2d Dist.1994). Thus, when we review suppression decisions, we must "accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 64} "The Fourth and Fourteenth Amendments to the United States Constitution prohibit any governmental search or seizure, including a brief investigative stop, unless supported by an objective justification." (Citations omitted.) *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991).

{¶ 65} "It is well established that the police may stop and briefly detain people for investigative purposes based on a reasonable suspicion of criminal activity." *State v. McKee*, 2d Dist. Montgomery No. 22565, 2008-Ohio-5464, ¶ 11, citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Reasonable suspicion entails some minimal level of objective justification for making a stop – that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause." *State v. Jones*, 70 Ohio App.3d 554, 556–57, 591 N.E.2d 810 (2d Dist.1990), citing *Terry* at 27.

{¶ 66} This particularized suspicion "must be based on the entire picture – a totality of the surrounding circumstances." *Andrews* at 87, citing *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). (Other citations omitted.) It is also "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." (Citations omitted.) *Andrews* at 87-88. When we review an officer's actions, we "must give due weight to [the officer's] experience

and training and view the evidence as it would be understood by those in law enforcement." *Id.* at 88, citing *Cortez.*

**{¶ 67}** As was noted, Detective Phillips was assigned to the narcotics bureau and had been working in the geographical area of the arrest for a long time. At the suppression hearing, Phillips testified that he had extensive experience in narcotics investigations, and that in the particular area where he was working that day, car-to-car drug sales were common. The area was an extremely high-crime area, known for drive-by shootings and a great deal of narcotics crime.

**{¶ 68}** Commonly, drug buyers park on the side of the street in front of vacant lots or boarded-up houses. Drug dealers are generally mobile, and pull up next to the buyer, where a very quick hand-to-hand transaction occurs, typically out of windows. In addition, drug dealers will drive up on the opposite side of the street from where a buyer is located; after a transaction is completed, both vehicles travel off in different directions.

**{¶ 69}** This is exactly what occurred on September 18, 2015. The red pickup truck stopped in front of a vacant lot, and the Chrysler 300 then drove up less than a minute later, traveling in the opposite direction from the pickup truck. The Chrysler then stopped so that the driver's side windows were next to each other. At that point, Phillips saw hands from each vehicle reach out toward each other, close enough to meet. The drivers then drove off in separate directions. Based on his experience, Phillips believed he had just seen a hand-to-hand drug transaction, and elected to follow the Chrysler. Phillips also indicated that he intended to have the Chrysler stopped for illegal window tint, but had to have a uniformed officer conduct the stop because he was in an unmarked vehicle. Before that could occur, the Chrysler pulled into the residence on Malden.

{¶ 70} The rest of Phillips' testimony at the suppression hearing was essentially the same as what he testified to at trial, including arriving at the house where the Chrysler had been left running, discovering Williamson attempting to flee from the window of the house, and recognizing Williamson as the person he had seen driving the car. In view of these circumstances, Phillips certainly had justification to stop and detain Williamson. We agree with the trial court that this analysis is essentially an academic exercise, because the police did not discover any drugs or weapons at that time, nor did Williamson make any statements to the police. In fact, he even refused to answer a question from the police about whether anyone else was in the house.

{¶ 71} Regarding the search of the car, we note that warrantless searches are " '*per se* unreasonable, under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions.' " *State v. Welch*, 18 Ohio St.3d 88, 91, 480 N.E.2d 384 (1985), quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One such exception is for automobiles, and provides that "a warrantless search of an automobile stopped by police officers who had probable cause to believe the vehicle contained contraband [is] not unreasonable within the meaning of the Fourth Amendment." *Welch* at 91, citing *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

{¶ 72} In such situations, however, an individual must have a "legitimate expectation of privacy" in an automobile or certain areas of an automobile. *Rakas v. Illinois*, 439 U.S. 128, 148-149, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any

of his Fourth Amendment rights infringed." (Citation omitted.) *Id.* at 134. For example, where a person has asserted neither property interests nor possessory interests in an automobile, no Fourth Amendment right exists. *Id.* at 148. *Accord State v. Tibbetts*, 92 Ohio St.3d 146, 165, 749 N.E.2d 226 (2001) (concluding the defendant had "no cognizable Fourth Amendment challenge" to search of an automobile, where he had no possessory interest in the car, did not own the car, did not have permission to drive the car, and did not claim any property or possessory interest in the vehicle's contents).

{¶ 73} To decide if "a defendant has a reasonable expectation of privacy," the court must first decide "whether 'the individual manifested a subjective expectation of privacy in the object of the challenged search.' " *State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 16, quoting *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986). (Other citation omitted.) "Then, a court must decide whether society is willing to recognize that expectation as reasonable." *Id.* The person who challenges a search's legality has the burden of proving that his or her "own Fourth Amendment rights were violated by the challenged search or seizure." (Citations omitted.) *Rakas* at 132, fn. 1; *Emerson* at ¶ 17.

{¶ 74} During the suppression hearing, Williamson specifically disclaimed a possessory interest in the Chrysler 300. *See* Transcript of Proceedings, Vol. I, pp. 10-11. His counsel also stated that Williamson did not have permission to drive the automobile or to place items in the vehicle. *Id.* at p. 12. Finally, Williamson's counsel stated that "there's nothing in that car, including the drugs, that belongs to my client, Your Honor." *Id.* Consistent with the decision in *Tibbets*, Williamson had "no legitimate expectation of privacy in [the car or its contents] and thus no cognizable Fourth

Amendment challenge to the officers' search." *Tibbetts* at 165, citing *Rakas* at 148. (Other citation omitted.)

{¶ 75} Based on the preceding discussion, we conclude that the trial court did not err in overruling Williamson's motion to suppress evidence. Accordingly, the Third Assignment of Error is overruled.

## V. Conclusion

{¶ 76} All of Williamson's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Lynne R. Nothstine
Andrew T. French
Christopher A. Deal
Hon. Timothy N. O'Connell